AMERICAN EQUIPMENT SERVICES, INC., Plaintiff,

v.

EVANS TRAILER LEASING COMPANY, Defendant.

Civ. A. No. C85–3873A.

United States District Court, N.D. Georgia, Atlanta Division.

Nov. 26, 1986.

Larry S. Bryant and Daryl L. Kidd, Bryant, Davis & Cowden, Atlanta, Ga., for plaintiff.

Paul M. Talmadge, Jr., Hurt, Richardson, Garner Todd and Cadenhead, Atlanta, Ga., Tom Pye, Chesnut & Livingston, Doraville, Ga., for defendant.

## ORDER

ROBERT H. HALL, District Judge.

Plaintiff brings this action alleging breach of contract and fraud and seeking declaratory, injunctive and monetary relief. Defendant brings a counterclaim seeking damages and expenses of litigation. This court's jurisdiction is predicated upon diversity of citizenship, 28 U.S.C. § 1332. Currently before the court is defendant's motion for summary judgment on plaintiff's claims and defendant's counterclaims.[1] For the reasons set forth herein, the court PARTIALLY GRANTS and PARTIALLY DENIES defendant's motion.

## FACTS

Plaintiff, American Equipment Services, Inc. ("AmQuip"), is in the business of renting and leasing over-the-road trailers in the metropolitan Atlanta area to private trucking companies or large corporations with truck fleets. Deposition of Bruce J. Gianetti, p. 172–173 ("Gianetti Depo."). AmQuip was formed in the fall of 1978 at which time its principals were James R. (Bob) Bennett and Bruce J. Gianetti.[2] Thomas E. Sullivan, who was Vice-President of Bob Bennett Trucking Company, was selected by Bennett and Gianetti to handle the acquisition of trailer equipment for AmQuip's use in the short-term rental market. Deposition of Thomas E. Sullivan, pp. 5–6, 11–12 ("Sullivan Depo."); Gianetti Depo., p. 115.

Sullivan investigated several trailer manufacturers including Budd, Strick, Trailmobile, Fruehauf, Dorsey and Evans Products Company. Evans Products Company, through its Monon Trailer Division ("Monon") was primarily in the business of manufacturing and selling trailers with the Monon trade name. Gianetti Depo., p. 173. Defendant Evans Trailer Leasing Company ("Evans") is a separate corporation which financed the trailer sold by Evans Products Company by purchasing them from Monon and leasing them on a long-term basis.

---

1. On September 8, 1986, plaintiff filed a motion to compel answers to plaintiff's fourth interrogatories and requests for production of documents or in the alternative motion for allowance of additional interrogatories and requests for production of documents. On October 14, 1986, defendant served its responses to plaintiff's fourth interrogatories and request for production of documents. Accordingly, plaintiff's motion is denied as moot.

2. James R. Bennett was killed sometime between the spring of 1979 and the fall of 1980. Following his death, Bruce J. Gianetti became the principal and sole shareholder of AmQuip. See Plaintiff's Brief in Response to Defendant's Motion for Summary Judgment, p. 7; Deposition of Thomas E. Sullivan, pp. 85–86.

Deposition of Richard E. Dessimoz, pp. 7, 90 ("Dessimoz Depo."). Thus, Evans is also in the business of renting trailers to customers. Gianetti Depo., pp. 140–142, 184–185, 187–190.

In the fall of 1978 both Sullivan and Gianetti handled discussions and negotiations with various trailer manufacturers. Eventually, AmQuip decided to enter into a leveraged lease agreement with Evans because Evans offered the best financing package. Sullivan Depo., p. 10. Accordingly, on April 11, 1979, AmQuip and Evans entered into a written equipment lease agreement which provided for the rental of 167 Monon trailers for a period of between eight and ten years. *See* Sullivan Depo., Exhibit "1". On October 23, 1980, the parties entered into a second equipment lease agreement for the lease of 100 trailers for a ten year period. *See* Sullivan Depo., Exhibit "2".

AmQuip contends that, prior to entering into the 1979 lease agreement, the parties reached a verbal agreement that Evans would not compete with AmQuip in short-term rentals (sometimes referred to as "casual rentals") in the Atlanta market for the duration of the lease that AmQuip had with Evans. Sullivan Depo., pp. 19–23, 51–54. Although the parties never entered into a written covenant not to compete, AmQuip alleges that the parties reached an oral non-competition agreement which agreement formed the consideration for AmQuip's execution of both the 1979 and 1980 long term lease. *Id.;* See also Gianetti Depo., pp. 121, 130–131, 155–157.

Evans admits that the parties discussed the issue of non-competition between Evans and AmQuip. Evans further admits that its ultimate purpose in the trailer rental market was to dispose of trailers manufactured by its parent either by sale or long-term lease. Evans does not dispute that in the fall of 1980 it did not believe that the short term rental market would be profitable. Dessimoz Depo., pp. 42, 85. See also Dessimoz letter dated September 16, 1980, Dessimoz Depo., Exhibit "D5".

Evans denies, however, that a non-competition agreement was ever reached. It argues that the terms of such an agreement remained vague and indefinite and that the parties never achieved a "meeting of the minds" with regard to a covenant not to compete. See Defendant's Brief in Support of Motion for Summary Judgment; Dessimoz Depo., pp. 36–38.

Although Evans maintained a sales office in Atlanta, until 1981 Evans' presence in Atlanta apparently was restricted to the sale and long-term lease market. Evans may have had approximately twenty trailers engaged in short-term rental activity in Atlanta, however, those were available for rental as a part of the sale and long-term lease effort. Dessimoz Depo., p. 50. In 1981, however, approximately 50% of the national trailer companies went into bankruptcy and Evans began receiving back from these companies large numbers of trailers which had been on long-term leases. Evans took back approximately 4000 trailers and put approximately 1500 trailers into the short-term rental market. Dessimoz Depo., p. 81. By February 1985, Evans' short-term rental fleet in Atlanta had risen to an inventory of 350 trailers. *Id.* at 78.

Because Evans was competing with AmQuip in the short-term rental market, AmQuip ceased making its monthly lease payments to Evans in February 1985. In July 1985 it instituted the instant action against Evans in the Superior Court of Fulton County claiming Evans breached the alleged oral non-competition agreement and misrepresented to plaintiff that it would not compete against it with the intent of deceiving plaintiff into entering into the lease agreements. Plaintiff also seeks reimbursement from Evans of all sums paid to Evans under the leases, rescission of the leases, specific performance of the alleged non-competition agreement, and interlocutory and permanent injunctions to prevent defendant from repossessing the trailers. Defendants[3] removed the action to this

---

**3.** On or about August 20, 1985, Evans Products     Company filed its "Suggestion of Bankruptcy" in

court and filed their counterclaim seeking past due rentals, liquidated damages, the deficiency obtained in repossessing and re-letting the trailers, and expenses of litigation.

On April 21, 1986, Evans filed its "Verified Complaint and Petition for Writ of Possession" in the State Court of Clayton County. On June 30, 1986, the Honorable Harold G. Benefield granted Evans' Writ of Possession with respect to certain of the trailers, requiring AmQuip to make rental payments into court with respect to the trailers retained by AmQuip. *American Equipment Services, Inc. v. Evans Trailer Leasing Co.*, Civil Action No. 86848–2 (State Court, Clayton County, June 30, 1986). Since June 30, 1986, AmQuip has turned over and Evans has accepted 247 trailers. AmQuip has paid into the registry of the state court $33,278.98 for the trailers which it retained.[4] See Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, p. 8. Further facts will be disclosed as necessary for discussion of the motion.

## DISCUSSION

Although plaintiff alleges that it reached an agreement with Evans with regard to a covenant not to compete, defendant denies that the parties entered into a binding oral agreement. Evans argues that the parties only agreed to agree in the future and that the terms of the alleged non-competition agreement were never formally defined or agreed upon by both parties. Evans contends that any evidence of the alleged oral agreement is inadmissible under the parol evidence rule and that, in any event, the alleged agreement is within the statute of frauds. Evans further contends that even if the parties did reach a binding oral agreement, the agreement is unenforceable as a matter of law in Georgia because such a covenant not to compete is an unlawful contract in partial restraint of trade. Finally, Evans argues that the alleged oral contract, even if binding, constitutes a *per se* violation of § 1 of the Sherman Anti-Trust Act.

### I. *No Agreement Reached*

■ AmQuip argues that the parties formed an oral covenant not to compete and cites case law to support the proposition that an oral contract may be enforceable despite the contemplation of a subsequent written contract. In *Barton v. Chemical Bank*, the former Fifth Circuit Court of Appeals stated that "when the expected written contract is only evidence of the oral agreement, the contract is binding once the parties have reached an oral agreement."[5] *Barton v. Chemical Bank*, 577 F.2d 1329, 1336 (5th Cir.1978). The crucial prerequisite to such a proposition, however, is that the parties reach an oral agreement.

The Georgia Supreme Court has held that

> The first requirement of the law relative to contracts is that there must be a meeting of the minds of the parties, and mutuality, and in order for the contract to be valid the agreement must ordinarily be expressed plainly and explicitly enough to show what the parties agreed upon. A contract cannot be enforced in any form of action if its terms are incomplete or incomprehensible....

*Bagwell-Hughes, Inc. v. McConnell*, 224 Ga. 659, 661–62, 164 S.E.2d 229 (1968) (*quoting West v. Downer*, 218 Ga. 235, 241, 127 S.E.2d 359 (1962) (citations omitted)). *See also Malone Construction Co. Inc. v.*

---

**4.** Given the June 30, 1986 order of the State Court of Clayton County and plaintiff's subsequent return of the majority of the trailers, Count VI of plaintiff's complaint in which it seeks injunctive relief appears moot.

the Superior Court of Fulton County. On February 28, 1986, this court stayed this action as to Evans Products Company pending the disposition of issues in the Bankruptcy Court. Accordingly, Evans Trailer Leasing Company is the sole remaining defendant in this action and brings the motion for summary judgment on its own behalf.

**5.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), this circuit adopted as precedent all former Fifth Circuit cases submitted or decided before October 1, 1981.

*Westbrook,* 127 Ga.App. 709, 710, 194 S.E.2d 619 (1972) ("unless an agreement is reached as to all terms and conditions and nothing is left to future negotiations, a contract to enter into a contract in the future is of no effect" and summary judgment is proper.); *Hartrampf v. Citizens & Southern Realty Investors,* 157 Ga.App. 879, 881, 278 S.E.2d 750 (1981).

In considering the validity of an alleged oral contract under Georgia law, the Eleventh Circuit Court of Appeals affirmed the ruling of the district court that the oral promise made to restructure a party's debt was "too indefinite to be enforceable." In *American Viking Contractors v. Scribner Equipment Co.,* 745 F.2d 1365 (11th Cir. 1984), the court stated that "the law of Georgia is clear that unless all terms and conditions are agreed upon and nothing is left to future negotiations, a contract to enter into a contract in the future is a nullity." *Id.* at 1369–1370.

The facts of *American Viking, supra,* are very similar to those of the instant action. Scribner brought suit against Nelson seeking the outstanding, unpaid balance due on a corporate purchase money note which Nelson had personally guaranteed. The trial court granted Scribner's motion for summary judgment and Nelson appealed claiming that several questions of fact should have been put before the jury. Nelson alleged that the parties had entered into an oral debt restructuring agreement and that he signed the guaranty based on Scribner's alleged promise to restructure the debt of AVC, a corporation owned by the Nelson family. Thus, Nelson filed a counterclaim seeking to have his guaranty declared null and void as a result of Scribner's failure to comply with the alleged oral contract to restructure AVC's debt.

The Eleventh Circuit in *Viking* disagreed with Nelson that issues of fact remained to be put before the jury. Although Nelson argued that the parties had reached a valid restructuring agreement and that the agreement was the inducement for his personal guaranty, Scribner maintained that, while the parties did discuss restructuring AVC's debt, the parties never reached a final agreement. Noting that on a motion for summary judgment the opposing party must come forward with significant probative evidence demonstrating the existence of a triable issue of fact, the Eleventh Circuit held that "Nelson's inability to show a meeting of the minds as to even a single term essential to a restructuring plan convinces us that the district court was justified in finding that there were no genuine issues as to any material fact regarding this issue." *Id.* at 1370.[6]

In the instant action, as in *American Viking,* AmQuip alleges that it and Evans reached a valid oral non-competition agreement prior to executing the 1979 and 1980 leases and that the alleged non-competition agreement was the inducement for AmQuip's entering into the written leases. Evans acknowledges that the party's discussed such a non-competition agreement and that it did not believe that it would be entering the short term rental market on a large scale. Evans contends, however, that the parties never finalized the non-competition agreement and that AmQuip executed the loans because of the favorable financing package offered by Evans and for consideration as recited in the lease.

It is undisputed that the parties never executed a written non-competition agreement. AmQuip admits that the only evidence tending to support a finding that the parties reached a valid agreement is contained in three letters and a telegram exchanged between the parties. In a letter dated February 20, 1980, Evans wrote AmQuip and stated "I have spoken with our

---

6. The United States Supreme Court has reinforced the summary judgment standard applied by the Eleventh Circuit in *American Viking.* In *Celotex Corp. v. Catrett,* — U.S. —, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the court held that The plan language of rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

attorneys in regard to non-competitive letter, and they have advised me that there are some legal problems and that they will advise me as to the content to which I can commit our corporation on such a document." Defendant's statement of Material Facts Not in Issue ("Defendant's Facts"), Exhibit "E". AmQuip later sent a telegram to Evans to accept the February 20, 1980 proposal. The telegram notes, "the lease terms which we accept are outlined in your letter dated February 20, 1980." Defendant's Facts, Exhibit "H".

AmQuip also refers to a letter written by its counsel to Evans in which AmQuip's counsel wrote, "I am informed by American that Evans has agreed ... not to compete during the term of the lease between American and Evans and in the area and with the customers of American. American is very anxious to reduce this agreement to writing.... Should an agreement not be forthcoming in regard to non-competition, the business relationship between American and Evans must be reevaluated." Defendant's Facts, Exhibit "F".

Finally, AmQuip points to a letter from Evans to AmQuip in which Richard Dessimoz wrote that Evans/Monon intended to maintain offices in Atlanta and the southeast to engage primarily in the sale and long term lease of new equipment. Dessimoz wrote that, while Evans might maintain a fleet in Atlanta, Evans planned to keep the fleet to a minimum. Dessimoz further wrote, "we do feel that a rental fleet consisting predominantly of Monon trailers maintained by American Equipment will compliment what we are trying to do in the area. In view of the large financial commitment we have made to American Equipment we have demonstrated our belief that our business will grow and that our presence in the market will benefit American Equipment." Defendant's Facts, Exhibit "G".

In addition to reviewing the exhibits listed above, the court has carefully reviewed the deposition testimony of Thomas Sullivan, Richard Dessimoz and Bruce Gianetti. Richard Dessimoz specifically denies reaching an agreement as to the terms of the alleged non-competition agreement. See Dessimoz Depo., pp. 36–38. He states that the territory which would be covered by a non-competition agreement was never defined, that the parties never agreed to what the definition of "Atlanta Market" would be, that the parties did not discuss the definition of "short-term rental", and that the parties did not discuss how long the non-competition agreement would last. Id. at 37, 82. Finally, Dessimoz asserts that Evans would not have agreed to a restrictive covenant not to compete such as AmQuip alleges was entered into by the parties. Id. at 89.

While both Sullivan and Gianetti assert that a non-competition agreement was reached between AmQuip and Evans, their deposition testimony is contradictory as to the terms and definitions agreed upon. Although in its brief AmQuip asserts that the alleged non-competition agreement prohibited Evans from competing in short-term rentals in the Atlanta market for the duration of the leases with Evans, the definitions and specific parameters of these three terms are not made certain even by Gianetti or Sullivan.

With regard to the term "short-term rental" or "casual rental", Gianetti admits there is no independent definition and that he would consider such to be either under three or five years or "anything less than what the long-term leverage lease was with Monon or any other company." Gianetti Depo., pp. 265–266. On the other hand, Sullivan states that a two year lease is not a short term rental but rather, "a committed lease," and that his "definition of short-term lease would be less than a year." Sullivan Depo., pp. 74–75. Gianetti admits that AmQuip never discussed the term "Atlanta market" with Evans and that the parties did not refer to any document to define "Atlanta market" or "metropolitan Atlanta." Gianetti Depo. p. 127. Throughout the deposition testimony the definition of "Atlanta market" varies from a six or nine or thirteen county area or a 50–mile radius. *See id.* at 126; Sullivan Depo. pp.

**1272**

23–24 ("And we didn't even agree to a 50 mile radius, but we just said the Atlanta market....").

Gianetti states that Evans gave AmQuip its assurances that it had no desire to compete with AmQuip. He also notes, however, that with regard to a specific agreement, "we were waiting. They told us they were sending us an agreement.... And we never got the agreement." Gianetti Depo. p. 129. He states that the most specific he can get regarding the alleged agreement was that Evans assured him that "They were not in the Atlanta market to plow the same earth...." *Id.* at 154. Furthermore, Gianetti admits that he was told before executing the 1980 lease that Evans' attorneys had legal problems with the non-competition letter and that the legal problems were "obviously not [resolved] because we never got the agreement that was promised us." Gianetti Depo. p. 144. Sullivan also acknowledges that details of the agreement "were implied in an overall agreement" and that he was aware that the agreement would be sent to the legal department where it would "all get worked out." Sullivan Depo. pp. 28, 102.

As the Eleventh Circuit noted in *American Viking,* "under Georgia law, an alleged contract cannot be enforced in any form of action if its terms are vague, indefinite and uncertain." *American Viking, supra,* 745 F.2d at 1369. In the instant action, Evans admits it discussed the issue of non-competition and did not foresee its entering into competition with AmQuip. Evans denies, however, that it ever reached a valid agreement not to compete with AmQuip. Furthermore, AmQuip's principal and agent concede that AmQuip "never got the agreement" and that AmQuip was waiting for the legal department to get the agreement "worked out." The terms of the alleged agreement remain vague, indefinite and uncertain, even to AmQuip's principal. The only exhibits AmQuip offers to support a finding that the parties entered into a valid non-competition agreement do not remove the uncertainty and vagueness of the terms of the alleged agreement nor

are they evidence that the verbal promise was reduced to writing. Accordingly, the alleged non-competition agreement is too indefinite to be enforceable. *See Hartrampf, supra* and cases cited therein.

Because the parties did not enter into a valid, enforceable agreement, Evans' arguments that the "agreement" is within the statute of frauds and that evidence of the "agreement" violates the parol evidence rule are inapplicable. Since the terms of the alleged agreement are indefinite and uncertain, the court cannot determine what the parties contracted to perform and whether either party engaged in part performance. Furthermore, the court cannot determine from vague terms of an alleged agreement whether the terms could be met within one year or whether the terms vary, contradict or are inconsistent with the terms of the written lease. *See Bagwell-Hughes, Inc., supra,* 224 Ga. at 662, 164 S.E.2d 229.

■ Having determined that AmQuip and Evans did not reach a valid, enforceable non-competition agreement, the court further finds that AmQuip's claim of fraud and misrepresentation must fail. In order to prove fraud under Georgia law, a plaintiff must prove that (1) the defendant misrepresented a material fact to plaintiff; (2) the defendant knew at the time that the fact was false; (3) the plaintiff justifiably acted upon the misrepresentation in reasonable reliance upon its veracity; and (4) the plaintiff was damaged by acting in reliance on the misrepresentation. *See Marriott Corp. v. American Academy of Psychotherapists, Inc.,* 157 Ga.App. 497, 277 S.E.2d 785 (1981); *City Dodge, Inc. v. Gardner,* 232 Ga. 766, 208 S.E.2d 794 (1974). Since the alleged covenant not to compete was never more than an agreement to agree and the terms of the alleged contract were never made definite or certain, AmQuip cannot have acted in reasonable reliance upon the veracity of Evans' assurances. *See American Viking, supra,* 745 F.2d at 1372. A promise which is unenforceable under Georgia law cannot

form the basis of a claim for fraud. *See White v. I.T.T.*, 718 F.2d 994, 997 (11th Cir.1983), *cert. denied*, 466 U.S. 938, 104 S.Ct. 1914, 80 L.Ed.2d 462 (1984).

## II. *Restraint of Trade*

■ Evans argues that even if this court were to find the alleged covenant not to compete to be valid, it nonetheless would be unenforceable under Georgia law because such covenants are held to be void on public policy grounds. The court agrees that the alleged non-competition agreement, if found to be binding, would nonetheless be unenforceable because it fails to definitely limit territorial extent and scope of the activities proscribed.

The Georgia Supreme Court has distinguished between covenants not to compete which are ancillary to the sale of a business and those which are ancillary to an employment contract. Covenants which are ancillary to franchise and distributorship agreements as well as covenants ancillary to contracts for services by independent contractors are treated by the Georgia Supreme Court like employee covenants ancillary to employment contracts. *See Jenkins v. Jenkins Irrigation, Inc.*, 244 Ga. 95, 97–98, 259 S.E.2d 47 (1979). "A covenant not to compete ancillary to an employment contract is enforceable only where it is strictly limited in time and territorial effect and is otherwise reasonable considering the business interest of the employer sought to be protected...." *Id.* (*Quoting Howard Schultz & Assoc. v. Broniec*, 239 Ga. 181, 183, 236 S.E.2d 265 (1977)).

Although AmQuip argues that the alleged non-competition agreement should be deemed ancillary to the sale of a business (which type of covenant is given greater latitude by the Georgia courts), this court believes that the lease agreement involved in the instant action is more analogous to a distributorship agreement than the sale of a business. In considering the enforceability of a covenant not to compete ancillary to a distributorship agreement, the Georgia Supreme court noted that "Non-competitive provisions in contracts will be enforced only if restraints are reasonable in time, reasonable and *definite* in territorial extent, and reasonable and *definite* in the nature of the business activities proscribed." *Barrett-Walls Inc. v. T.V. Venture, Inc.*, 242 Ga. 816, 818–819, 251 S.E.2d 558 (1979) (emphasis added).

Although the Georgia courts will relax the requirement that territory, time limitation and scope of activities be strictly limited and definite if a covenant not to compete is made ancillary to the sale of a business, the sale of a business' assets or equity in the business must occur. In the instant case, Evans leased its equipment to AmQuip on a long term basis. The facts are more closely analogous to the covenant not to compete which is ancillary to a franchise or distributorship agreement than the sale of a business' assets. Thus, the alleged non-competition agreement between AmQuip and Evans, even if found to be a binding contract, would be unenforceable under Georgia law because the terms of the agreement are not definite or strictly limited in time and territorial effect.[7]

## III. *Defendant's Counterclaim*

■ Evans brings a counterclaim against AmQuip alleging AmQuip has failed to make timely payment of all rentals due under the 1979 and 1980 leases. AmQuip admits it discontinued rental payments as of February 1985 but argues that its failure to make payments resulted from Evans alleged breach of the alleged non-competition agreement. Evans contends that AmQuip is in default under the 1979 and 1980 leases and therefore seeks damages plus penalties for past due rentals, liquidated damages, deficiency in rentals obtained upon reletting the repossessed trailers and expenses of litigating the action.

---

**7.** Because the court finds that the alleged non-competition agreement is not a valid, binding contract due to the parties' failure to agree and, in the alternative, the alleged agreement is an unenforceable partial restraint of trade, the court need not address defendant's argument that the alleged agreement violates § 1 of the Sherman Antitrust Act.

AmQuip's argument that it was entitled to discontinue payments under the leases must fail given the court's finding that the parties never reached a valid, binding non-competition agreement and, in the alternative, that such an agreement, if valid, is unenforceable under Georgia law. The equipment leases provide in part, "In consideration of and in reliance upon the undertakings of the Lessee, Evans desires to lease the Equipment to Lessee upon the terms and conditions set forth herein." Sullivan Depo., Exhibit "2".

It is undisputed that the written leases contain no covenant against competition. Furthermore, because the alleged oral non-competition agreement is invalid, AmQuip cannot justify non-payment under the leases on partial failure of consideration by Evans. Similarly, the alleged non-competition agreement cannot support the application of the principles of set-off or recoupment. *Cf., American Viking, supra,* 745 F.2d at 1370–1371 (alleged oral agreement cannot support defenses of failure of consideration, want of consideration or estoppel).

Having found that AmQuip had no legal basis to withhold rental payments due under the leases, the court finds that AmQuip is in default under the lease. The 1979 and 1980 leases provide that in the event of plaintiff's default, Evans may pursue any or all of four specific remedies. In its counterclaim, Evans seeks the cumulative award of past due rentals, liquidated damages and the deficiency obtained in reletting the repossessed trailers.

Although in an affidavit filed with its motion for summary judgment, Evans shows that it is entitled to liquidated damages in the amount of $891,064.88, the court finds that this sum constitutes a penalty which must be disallowed under Georgia law. *See Southeastern Land Fund, Inc. v. Real Estate World, Inc.,* 237 Ga. 227, 230–31, 227 S.E.2d 340 (1976). Furthermore, because Evans elected to file suit in the State Court of Clayton County and has indeed repossessed the majority of its trailers, the court finds that Evans is only entitled to past due rentals and the deficiency obtained in reletting the trailers. *See Pinkerton's Inc. v. Palmer, Inc.,* 113 Ga.App. 859, 149 S.E.2d 859 (1966).

In summary, the court:

1) DENIES plaintiff's motion to compel as moot;

2) GRANTS defendant's motion for summary judgment with regard to all of plaintiff's claims; and

3) PARTIALLY GRANTS defendant's motion for summary judgment with regard to its counterclaim.

The only issue which remains to be determined in this action is the amount of defendant's damages.